UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JOSE GONZALES,                    )
                                  )
              Petitioner          )
                                  )
      v.                          )        Case No. 4:04-cv-02387-IPJ-HGD
                                  )
SCOTT HASSELL, CHIEF              )
CORRECTIONS OFFICER FOR           )
ETOWAH COUNTY,                    )
                                  )
              Respondent          )

## MEMORANDUM OPINION

Petitioner, Jose Gonzales,[1] has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  He challenges his continued detention pending deportation to Venezuela and seeks immediate release under an order of supervision.  Respondents contend that petitioner is not due to be released from custody pending removal.

### FACTUAL AND PROCEDURAL BACKGROUND

#### Administrative and Judicial Proceedings

Gonzales is a native and citizen of Venezuela.  He entered the United States in 1993 as a non-immigrant visitor with permission to remain in the United States for

---

[1] The court notes that in some documents the petitioner is referred to as "Jose Gonzalez."

a period not to exceed six months.  (Doc. #5, Exs. A and B).  On August 24, 2000, petitioner was convicted in the New York State Supreme Court, Queens County, of attempted criminal sale of a controlled substance (cocaine) in the third degree. (Doc. #5. Ex. C).  Gonzales was sentenced to serve nine months of imprisonment for this conviction.  (*Id.*).

As a result of Gonzales' criminal conviction, the Immigration and Naturalization Service (INS) issued a Notice to Appear on October 26, 2000.  The Notice charged petitioner with being removable pursuant to 8 U.S.C. §§ 1227(a)(1)(B), 1227(a)(2)(B)(i) and 1227(a)(2)(B)(iii), as an alien who had remained in the United States longer than permitted and as an alien who had been convicted of an offense related to a controlled substance and a drug trafficking offense as defined at 8 U.S.C. § 1101(a)(43)(B).  (Doc. #5, Ex. D).

On April 6, 2001, an Immigration Judge in Oakdale, Louisiana, ordered petitioner's removal to Venezuela.  (Doc. #5, Ex. E).  Petitioner reserved an appeal (*id.*) and appealed the removal order to the Board of Immigration Appeals (BIA). (Doc. #5, Ex. F).  On August 17, 2001, the BIA dismissed petitioner's appeal. (Doc. #5, Ex. G).  It found that Gonzales admitted the factual allegations contained in the Notice to Appear, and such admissions were sufficient to establish his removability.  It further found that although petitioner initially indicated to the

2

Immigration Judge that he wanted to apply for relief from removal under the Convention Against Torture, he indicated at the hearing that he was not seeking any form of relief.  (*Id.*).

On October 29, 2001, the INS approved a Form I-130 Petition for Alien Relative filed on petitioner's behalf by George Roco Smith.  (Doc. #5, Ex. H).  After the dismissal of his appeal by the BIA, Gonzales filed motions to reopen and reconsider and a motion for stay of removal.  The motion for stay of removal was denied by the BIA on December 12, 2001.  (Doc. #5, Ex. I).  The motions to reopen and reconsider were denied by the BIA on January 31, 2002.  (*Id.*).

Gonzales has filed three other habeas corpus petitions with respect to his removal:  *Gonzalez v. INS*, Civil Action No. 01-2550 (W.D.La.), *Gonzalez v. Ashcroft, et al.*, Civil Action No. CV-01-7004 (E.D.N.Y.), and *Gonzalez v. Ashcroft*, Civil Action No. 1:04-CV-00225-ERK (E.D.N.Y.).  On February 26, 2002, United States District Judge James T. Trimble, Jr., of the Western District of Louisiana denied the habeas corpus petition filed there and dismissed the case with prejudice. (Doc. #5, Ex. K).  United States District Judge Edward R. Korman of the Eastern District of New York denied Gonzales' habeas corpus petition on September 10, 2002.  (Doc. #5, Ex. L).  The habeas corpus petition filed in 2004 in the Eastern

District of New York was still pending at the time of the respondent's answer herein. (Doc. #5, Ex. M).

**Travel Documents**

On August 28, 2001, the Department of Homeland Security (DHS), successor to the INS, requested a travel document from the Consulate General of Venezuela. (Doc. #5, Ex. N). DHS provided the Consulate General with two sets of fingerprints, as requested by the Consulate, on September 13, 2001. (Doc. #5, Ex. O). On October 12, 2001, DHS Oakdale requested assistance from DHS Detention and Removal Section at Headquarters in obtaining a travel document for petitioner. (Doc. #5, Ex. P). On November 26, 2001, the Consulate General of Venezuela notified DHS that it had confirmed petitioner's status as a Venezuelan citizen and indicated it would be able to issue a travel document for him "any day from now." (Doc. #5, Ex. Q). The Consulate General of Venezuela sent a facsimile to DHS on September 9, 2002, indicating it was waiting for an answer from its government to verify petitioner's nationality. (Doc. #5, Ex. R). DHS followed up with a letter on October 29, 2002, requesting that the Consulate General of Venezuela issue a travel document for Gonzales. (Doc. #5, Ex. S).

On December 2, 2002, the Immigration and Customs Enforcement (ICE) office in Oakdale requested assistance from its Headquarters Detention and Removal section in obtaining the necessary travel document. (Doc. #5, Ex. T). Subsequently, on May 16, 2003, the Consulate General of Venezuela informed ICE that it did not recognize petitioner to be a Venezuelan citizen. Instead, it would need petitioner's Venezuelan identification number or birth certificate for verification. (Doc. #5, Ex. U).[2] Therefore, on October 21, 2003, DHS asked for help from INTERPOL in verifying the authenticity of a Venezuelan birth certificate submitted in conjunction with petitioner's application for an immigrant visa. (Doc. #5, Ex. V).

On February 13, 2004, INTERPOL notified the Department that the birth certificate submitted by ICE was genuine and that a Jose Gregorio Gonzales Rivas was registered in the National Identification Files of Venezuela. (Doc. #5, Ex. X). On February 19, 2004, a deportation officer in Oakdale, Louisiana, attempted to get petitioner's photograph and fingerprints; however, according to a memorandum prepared by the officer, petitioner refused to cooperate and became irate. (Doc. #5, Ex. Z).[3] The officer's notes indicate that the last attempt to contact the Consulate

---

[2] According to the custody review report issued May 22, 2003, petitioner had claimed to be a Venezuelan citizen, and a travel document was available. However, the Venezuelan Consulate then received information by telephone that petitioner was instead a citizen of Trinidad. (*See* Doc. #5, Ex. GG).

[3] As discussed *infra*, petitioner thereafter began cooperating with attempts to obtain a travel document by submitting fingerprints and photographs.

General of Venezuela, as of October 2004, was on September 13, 2004.  (Doc. #5, Ex. Y).  As of the filing of respondents' response to the order to show cause, on October 20, 2004, no travel document had been issued for petitioner.

By October 2004, petitioner had been served with a Form I-229, Warning for Failure to Depart, on five occasions. (Doc. #5, Ex. AA).  The form and instructions advised petitioner of his responsibility to assist ICE in obtaining a travel document and consequences for failure to apply for a travel document or otherwise hampering his removal.  (*Id.*).

**Custody Status Reviews**

During petitioner's detention, his custody status has been reviewed repeatedly.  On August 30, 2001, petitioner was provided notice that his status would be reviewed on or about October 17, 2001.  (Doc. #5, Ex. BB).  On November 23, 2001, the Department concluded that petitioner should remain in custody due to his refusal to cooperate with the removal process by submitting to fingerprinting in conjunction with an application for a Venezuelan travel document.  (Doc. #5, Ex. DD).  The Department also concluded there was a high probability that petitioner would engage in criminal activity in the future.  (Doc. #5, Exs. CC & DD).  On December 19, 2001,

petitioner was served with a notice that he would remain in ICE custody.  (Doc. #5, Ex. DD).

On February 26, 2003, petitioner was provided notice that his status would be reviewed on or about March 25, 2003.  (Doc. #5, Ex. EE).  A custody review conducted in March 2003 concluded that petitioner and his family had engaged in actions that would prevent his removal to Venezuela,  (Doc. #5, Ex. FF). Specifically, the review noted that once it became apparent that the Consulate General of Venezuela intended to issue a travel document for petitioner, petitioner's mother allegedly informed the consulate that petitioner was born in Trinidad.  (*Id.*).[4]  On June 3, 2003, petitioner was served with a notice that he would remain in ICE custody.  (Doc. #5, Ex. GG).

On February 24, 2004, petitioner was provided notice that his status would be reviewed on or about March 22, 2004.  (Doc. #5, Ex. HH).  On March 18, 2004, the Department acknowledged that petitioner had begun cooperating with the government by submitting fingerprints and photographs and advised that another custody review would be scheduled.  (Doc. #5, Ex. II).  A Notice of Compliance was issued by the Department on March 18, 2004, and served on petitioner on March 23, 2004. (Doc. #5, Ex. JJ).

---

[4] It appears from records submitted by respondents that petitioner's mother was born in Trinidad and his father was born in Venezuela.  (*See* Doc. #5, Ex. A).

On March 23, 2004, petitioner was notified that his status would be reviewed on or about April 20, 2004.  (Doc. #5, Ex. KK).  On May 13, 2004, petitioner was provided notice that his status would be reviewed on or about June 11, 2004. (Doc. #5, Ex. LL).  About this time, Dr. Kenneth Marsh-Jaramillo conducted a mental health evaluation of petitioner.  In his report dated May 26, 2004, Dr. Marsh-Jaramillo concluded that petitioner should not be released from custody because of his poor conduct while incarcerated (including three disciplinaries for masturbating in front of female correctional staff and disciplinaries for failing to obey orders) and because he had not been credible and cooperative with immigration authorities. (Doc. #5, Ex. MM).  Dr. Marsh-Jaramillo noted that petitioner had arrived in the United States when he was 12 years old with his mother and three brothers, spoke Spanish poorly and did not want to return to Venezuela; therefore, he had fought efforts to deport him to Venezuela.  However, it was opined that petitioner was starting to cooperate due to tiring of detention.  (*Id.*).

The custody review conducted in June 2004 concluded petitioner should remain in custody because both petitioner and his family had repeatedly hampered attempts to secure a travel document for him.  (Doc. #5, Ex. NN).  On June 23, 2004, petitioner was served with a notice of the government's decision to continue his detention.  (Doc. #5, Ex. OO).  On June 24, 2004, petitioner's case was forwarded to

the Department Headquarters Post Order Detention Unit for Review.   (Doc. #5, Ex. PP).

## DISCUSSION

With respect to detention, release and removal of aliens ordered removed, Title 8 U.S.C. § 1231(a) gives the Attorney General a 90-day period to accomplish the removal of an alien following the entry of a final order of deportation.  Title 8 U.S.C. § 1231(a)(1)(B) provides:

> The removal period begins on the latest of the following:
> (i) The date the order of removal becomes administratively final.
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

Title 8 U.S.C. § 1231(a)(1)(C) provides that

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

The Supreme Court held in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), that § 1231(a) authorizes detention for a period reasonably necessary to accomplish the alien's removal.  *Id.* at 699-700, 121 S.Ct. at 2504.  The

9

court found that six months is a presumptively reasonable period of time to allow the

government to remove an alien after the removal period has commenced.  *Id.* at 701,

121 S.Ct. at 2505.  The Supreme Court further stated that:

> After this 6-month period, once the alien provides good
> reason to believe that there is no significant likelihood of
> removal in the reasonably foreseeable future, the
> Government must respond with evidence sufficient to rebut
> that showing.  And for detention to remain reasonable, as
> the period of prior postremoval confinement grows, what
> counts as the "reasonably foreseeable future" conversely
> would have to shrink.  This 6-month presumption, of
> course, does not mean that every alien not removed must
> be released after six months.  To the contrary, an alien may
> be held in confinement until it has been determined that
> there is no significant likelihood of removal in the
> reasonably foreseeable future.

*Id.*

In this case, petitioner has not demonstrated a significant unlikelihood of his

removal to Venezuela in the reasonably foreseeable future.  First, petitioner has

alleged no institutional barriers to the repatriation of aliens to Venezuela.  The United

States has a repatriation agreement with Venezuela.  In *Zadvydas*, the Supreme Court

considered the cases of two aliens and found that both demonstrated that there was

no significant likelihood of removal in the reasonably foreseeable future,

necessitating their release from custody.  One alien was from Cambodia, a country

with which the United States has no repatriation agreement.  As a result, there was

virtually no hope of repatriating that alien back to his native land. *Zadvydas*, 533 U.S. at 686, 121 S.Ct. at 2496-97. The other alien was born in a refugee camp in Germany in 1948 and was not a citizen of any country; therefore, no other nation ever would accept him, no matter the efforts of the INS. *Id.* at 684, 121 S.Ct. at 2495-96. The facts surrounding petitioner's detention differ considerably from the facts in *Zadvydas*.

Petitioner also has made no showing that there are particular individual barriers to his repatriation to Venezuela. Travel documents have been requested from Venezuela, and the Venezuelan Consulate has confirmed that Gonzales is a citizen of Venezuela. The lack of visible progress since the United States government requested travel documents from the Venezuelan government does not in and of itself meet petitioner's burden of showing that there is no significant likelihood of removal. The mere fact that the Venezuelan government has taken its time in responding to the request for travel documents does not mean that it will not do so in the future. In short, petitioner has not alleged facts indicating that Venezuela will never issue him papers, nor has he alleged any reasons why Venezuela would not ultimately comply with a request from the United States government in this particular instance.

The Court concludes that petitioner, in effect, seeks to place the burden on the government to show when it will remove petitioner. However, in *Zadvydas*, the

Supreme Court held that it is petitioner's burden first to show good reason to believe that there is no significant likelihood of removal. All petitioner has shown is the passage of some time, during much of which petitioner and his family were uncooperative with attempts to obtain travel documents. Unlike the aliens in *Zadvydas*, for whom deportation seemed impossible no matter how long they waited, there is no reason to believe that Gonzales will not ultimately be returned to Venezuela.

Based on the foregoing, the Court finds that the petition for writ of habeas corpus is due to be denied. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 22nd day of September, 2005.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE